# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
NATIONAL ASSOCIATION OF HOME )
BUILDERS, *et al.* )
)
           Plaintiffs, )
) Civ. Action No. 12-2013 (EGS)
    v. )
)
U.S. FISH AND WILDLIFE SERVICE, )
*et al.*, )
)
          Defendants. )
_____)

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiffs are four organizations[1] representing member landowners and businesses in Central Texas and Washington state. They seek injunctive and declaratory relief to set aside and void two Court-approved agreements ("Agreements") that were made between environmental advocacy groups and the Fish and Wildlife Service ("Service") in 2011 to settle multi-district litigation ("MDL"). *See In re ESA Section 4 Deadline Litig. – MDL No. 2165*, Misc. Action No. 10-377 (D.D.C. 2010), WildEarth Guardians Settlement Agreement ("Guardians Agreement"), ECF No. 31-1; *and* Center for Biological Diversity Settlement Agreement ("CBD Agreement"), ECF No. 42-1. The Agreements require the Service

---

[1] Plaintiffs are: the National Association of Home Builders, Olympia Master Builders, Home Builders Association of Greater Austin, and the Texas Salamander Coalition, Inc. Compl. ¶ 1.

- 1 -

to determine by certain deadlines whether to list 251 species as endangered or threatened under the Endangered Species Act ("ESA"), or find that listing these species is not warranted. Certain of the 251 species either live on, or could live on, land owned or used by Plaintiffs' members. Compl. ¶¶ 32-36. Plaintiffs do not challenge any particular listing decision. Pl.'s Opp'n to Defs.' Mot. to Dismiss 13.

Rather, Plaintiffs claim that the Agreements require the Service to violate *procedures* to list species that are mandated by Section 4 of the ESA. Compl. ¶¶ 80-95.

The Service and Secretary of Interior ("Defendants") have moved to dismiss for lack of Article III standing, *inter alia*.[2] The Center for Biological Diversity ("CBD"), one of the plaintiffs in the MDL, has moved to intervene in support of the defendants. In their opposition to the motion to dismiss, Plaintiffs argue that they have standing on the grounds that the Agreements have caused injury to their members' conservation, property, and business interests. Pl.'s Opp'n 12.

This case marks the latest in a series of challenges to the MDL. This Court and the Circuit Court have considered and rejected nearly identical standing arguments in three prior

---

[2] Defendants also move to dismiss for failure to state a claim under the Administrative Procedure Act and the Endangered Species Act. Defs.' Mot. to Dismiss at 34-44. Because the Court concludes plaintiffs have no Article III standing, it need not reach these alternative arguments.

decisions concerning the MDL. *In re Endangered Species Act Deadline Litig.* ("*Safari Club I*"), 277 F.R.D. 1 (D.D.C. 2011), *aff'd* 704 F.3d 972 (D.C. Cir. 2013) (hereinafter "*Safari Club II*"), *reh'g en banc denied* (Apr. 29, 2013); *In re ESA Section 4 Deadline Litig.* ("*Tejon Ranch*"), 270 F.R.D. 1 (D.D.C. 2010). In *Tejon Ranch*, TRC, a landowning corporation, moved to intervene in the MDL on the claim that the Service's decision to list a species encompassed by the litigation would injure its conservation, property and business interests by precipitating restrictions on the use of its land. *Tejon Ranch*, 270 F.R.D. at 5. The Court denied TRC's motion to intervene for lack of standing. *Id.* Because the MDL was limited to whether the Service had followed listing procedures under the ESA, and not whether the Service had made the correct substantive decision to list any species, the Court concluded that TRC's potential injuries were neither caused by, nor redressable in, the MDL. *Id.* In *Safari Club I*, this Court denied a hunting group's motion to intervene in the MDL for the same reason. *Safari Club I*, 277 F.R.D. at 3. The hunting group, Safari Club, alleged that the since-finalized Agreements injured its members' conservation and procedural interests by requiring the Service to decide by certain dates whether to list three species that they hunted. *Id.* at 4-7. The Court found that Safari Club's asserted conservation injury was indistinguishable from TRC's

- 3 -

because it was also based entirely on the potential substantive outcome of the Service's listing determinations. *Id.* at 3.

As to Safari Club's alleged procedural injury, the Court concluded that Safari Club failed to identify any part of the Agreements that required the Service to violate procedural requirements. *Id.* at 7. *Safari Club I* was subsequently affirmed by this Circuit, which found that "Safari Club has failed to identify a violation of a procedural right afforded by the ESA that is designed to protect its interests." *Safari Club II*, 704 F.3d at 979.

Even more recently, this Circuit considered, and rejected, nearly identical standing arguments in *Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317 (D.C. Cir. 2013), *reh'g en banc denied* (June 10, 2013). In that case, a trade association moved to intervene on behalf of its members to oppose a consent decree reached between environmental groups and the Environmental Protection Agency ("EPA").[3] The consent decree required the EPA to propose rulemaking under the Clean Water Act ("CWA") by certain dates. *Perciasepe*, 714 F.3d at 1321. The trade association alleged that the consent decree caused injury to its members by providing too little time for its members to participate in the CWA rulemaking, *id*. at 1323, and requiring

---

[3] The National Association of Home Builders, one of the plaintiffs in this case, participated in *Perciasepe* as amicus curiae in support of the trade association. *Id.*

its members to spend money to respond to the EPA's information requests, *id.* at 1326.  Again, the Circuit denied the motion to intervene for lack of standing, holding that the consent decree did not cause injury to the trade association's members because it only established a timeline by which the EPA must conduct a rulemaking—it did not dictate the substantive content of that rulemaking.  *Id.* at 1324-26.

Taken together, the above cited cases constitute precedent that binds this Court on the issue of Article III standing.  Plaintiffs' arguments for standing are indistinguishable from those squarely addressed and rejected by the four decisions described above.  Therefore, for the reasons below, the Court will **DENY** Plaintiffs' prayer for injunctive and declaratory relief and **GRANT** Defendants' motion to dismiss.  Accordingly, the Court will **DENY** as moot Center for Biological Diversity's motion to intervene.

## II.  BACKGROUND

### A. Statutory Background

The Endangered Species Act was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] a program for the conservation of such endangered species and threatened species."  Endangered Species Act of 1973 § 2, 16 U.S.C. § 1531(b) (2012).  Section 4 of the ESA directs the Service,

- 5 -

acting on behalf of the Secretary of Interior, to determine whether a particular species should be listed as endangered or threatened, *id.* § 1533(a), and when such a determination is made, to designate "critical habitat" for the species, *id.* § 1533(a)(3)(A)(i).  The Service must decide whether to list a species "solely on the basis of the best scientific and commercial data available." § 1533(b)(1)(A).  The ESA's protections apply only after a species is listed as endangered or threatened.  *Id.* § 1538(a).

Members of the public may petition the Service to list a species.  *See id.* § 1533(b)(3).  For every petition to list a species, the Service must find whether listing is (1) not warranted, (2) warranted, or (3) warranted but precluded by pending proposals to list other species.  *Id.* § 1533(b)(3)(B). If listing is warranted, the Service must (1) promptly publish a proposed rule, *id.* § 1533(b)(3)(B)(ii), and (2) within one year publish a final rule, withdraw the proposed rule, or delay a final decision for up to six months to solicit more scientific information, *id.* § 1533(b)(6)(A)(i), 1533(b)(6)(B)(i).

The Service must annually review the species whose listing is warranted-but-precluded, *id.* § 1533(b)(3)(C)(i), and implement a system to monitor their status and "prevent a significant risk to the well being of any such species," *id.* § 1533(b)(3)(C)(iii).  In addition, the Service must also

establish guidelines that include a ranking system to help identify species that should receive priority review for listing. *Id.* § 1533(h)(3).

## B. Factual and Procedural Background

The Service annually publishes its latest findings on warranted-but-precluded species ("candidate species") in a Candidate Notice of Review ("CNOR") published in the Federal Register. *See, e.g.*, 2010 CNOR, 75 Fed. Reg. 69,222 (Nov. 10, 2010). Because the number of warranted-but-precluded findings has outpaced the number of listings, the backlog of candidate species had grown to 251 as of 2010. *See id.* at 69,224. The species are afforded no protection under the ESA while on the candidate list. *See* 16 U.S.C. § 1538(a).

The Agreements reached in the MDL and at issue in this case seek to clear the backlog of species on the 2010 CNOR. They do not dictate that the Service reach any particular substantive outcome on any petition or listing determination. *Safari Club I*, 277 F.R.D. at 4. They only require the Service to make *some* determination—-to publish either proposed listing rules or not-warranted findings—-for the backlog of species by the end of September 2016. Guardians Agreement, *MDL*, ECF No. 31-1 at 6; CBD Agreement, *MDL*, ECF No. 42-1 at 5-6.

Of the candidate species on the 2010 CNOR, nine subspecies of Mazama pocket gopher and four species of Texas salamander[4] either live on, or could live on, land owned or used by Plaintiffs' members.  Compl. ¶¶ 32-36.  The Mazama pocket gopher has been a candidate species since 2001, 66 Fed. Reg. 54,808 (Oct. 30, 2001), and three of the four salamander species have been candidates for more than ten years, *see* 67 Fed. Reg. 40,657 (June 13, 2002).  In 2012, pursuant to deadlines stipulated in the Agreements, the Service proposed to list four of the nine subspecies of Mazama pocket gopher as threatened, 77 Fed. Reg. at 73,770 (Dec. 11, 2012), proposed to list the four species of salamander as endangered, 77 Fed. Reg. at 50,768 (Aug. 22, 2012), and also proposed critical habitat in Washington and Texas for the species proposed for listing, 77 Fed. Reg. at 73,770; 77 Fed. Reg. at 50,768.  The Service also concluded that three of the nine subspecies of Mazama pocket gopher did not warrant listing, one subspecies was extirpated, and one subspecies was not actually a member of the same species (and therefore did not warrant listing).[5]  77 Fed. Reg. at 73,770.

---

[4] The four species of salamander at issue are the Austin Blind salamander, Jollyville Plateau salamander, Georgetown salamander, and Salado salamander.  77 Fed. Reg. at 50,768.

[5] On August 20, 2013, the Service issued a final rule to list the Austin Blind salamander as endangered and the Jollyville Plateau salamander as threatened.  78 Fed. Reg. 51,278.  On February 24, 2014, the Service issued a final rule to list the Georgetown

Plaintiffs sued Defendants on December 17, 2012, soon after the Service published its proposed rules for the Mazama pocket gopher and salamander species. Importantly, Plaintiffs do not challenge any final rules to list species covered by the Agreements. Rather, all of Plaintiffs' claims arise from the timelines, set by the Agreements, for the Service to determine whether or not listing is warranted. Compl. ¶¶ 80-95.

## III. DISCUSSION

Defendants move to dismiss for lack of Article III standing. Defs.' Mem. 16-23. Plaintiffs oppose Defendants' motion and assert representational standing on behalf of its members. Pl's Opp'n 10. Plaintiffs assert three bases for their members' standing: (1) the Agreements will impair members' existing and future conservation efforts; (2) they will increase regulatory restrictions on members' use of private land, causing economic harm; and (3) the Agreements cause FWS to breach its legally required procedures, and those breaches harm members' concrete interests. Pl.'s Opp'n 9, 12-13, 22.

### A. Article III Standing

Standing is the threshold question in every federal case that determines the Court's power to entertain the suit. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To establish

---

salamander as endangered and the Salado salamander as threatened. 79 Fed. Reg. 10,236.

representational standing, an association must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 12 (D.C. Cir. 2011) (quotation marks omitted). The government disputes the first of these elements: whether Plaintiffs' members would have standing to sue in their own right.

To establish that their members have Article III standing in their own right, Plaintiffs must demonstrate that their members have suffered 1) an injury in fact, 2) fairly traceable to the challenged action, that is 3) redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An injury in fact must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citations and internal quotation marks omitted). The injury "must be *certainly impending*," and "'[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Intern.*, 133 S.Ct. 1138, 1147 (2013) (emphasis in original).

### 1. Injuries resulting from the rulemaking process

Plaintiffs allege two types of injury resulting from the Agreements' effect on the listing process. At the outset, the Court notes that this Circuit in *Perciasepe* rejected standing based on similar assertions of injury resulting from a settlement agreement's effect on the rulemaking process. In *Perciasepe*, appellant-intervenor sought standing based on asserted injury resulting from a consent decree that required the Environmental Protection Agency ("EPA") to propose rulemaking by a certain date. 714 F.3d at 1321-1322. The Circuit found that:

> the consent decree does not *require* EPA to promulgate a new, stricter rule. Instead, it merely requires that EPA conduct a rulemaking and then decide whether to promulgate a new rule—the content of which is not in any way dictated by the consent decree—using a specific timeline.

*Id.* at 1324 (emphasis in original). *Perciasepe* thus rejected intervenor's standing, because "Article III standing requires more than the possibility of potentially adverse regulation." *Id.* at 1324-25.[6]

---

[6] A number of decisions in this court, including but not limited to the opinions in the MDL and discussed above, have found no standing in similar circumstances. *See, e.g., Ctr. for Biological Diversity v. EPA*, 274 F.R.D. 305, 311 (D.D.C. 2011) (finding that aircraft manufacturers had no standing to intervene in action which sought to compel EPA to respond to plaintiffs' petitions to regulate greenhouse gases, because the

The same reasoning applies here.  Like the consent decree

in *Perciasepe*, the Agreements "do not dictate that [the Service]

reach any particular substantive outcome on any petition or

listing." *Safari Club I*, 277 F.R.D. at 4.  They merely require

the Service to determine—according to a specific schedule—

whether listing of the species is warranted or not.  *Id.*  "That

the consent decree prescribes a date by which regulation *could*

occur does not establish Article III standing." *Perciasepe*, 714

F.3d at 1325 (emphasis in original).  Similarly, that the

Agreements set dates by which the Service *could* list warranted

species does not establish Article III standing for Plaintiffs.

This reasoning informs the following discussion of Plaintiffs'

asserted injuries.

### a. *Injury to conservation efforts*

Plaintiffs first argue that their members have standing

because the Agreements impair their members' existing and future

conservation efforts.  Pl.'s Opp'n 14.  Specifically, Plaintiffs

claim that the Agreements require the Service to propose listing

candidate species by certain dates without taking into account

---

court's decision would only "require EPA to make the
determination (whether greenhouse gases endanger public health),
not to reach any particular result."); *Envtl. Defense v. Leavitt*,
329 F. Supp. 2d 55, 68 (D.D.C. 2004) (holding that coal industry
group lacked standing to challenge consent decree requiring the
EPA to issue clean air regulations by a date certain, because
"the decree does not address the substance of the [regulations]
but merely sets a schedule for their promulgation.")

conservation efforts by their members that could reduce or eliminate the need to list the species. *Id.* at 18.

Plaintiffs' "conservation interest" basis for standing is similar to that rejected by this Court in *Tejon Ranch*. In that case, private property owners ("TRC") sought standing to intervene in litigation seeking to compel the Service to determine by a certain date whether listing of the Tehachapi slender salamander species was warranted. *See Tejon Ranch*, 270 F.R.D. at 2. TRC owned land that the Tehachapi slender salamander lived on, and had spent years working with the Service on a conservation plan for the species. *Id.* at 3. TRC claimed that the timing of the Service's listing determination would injure its interest in ensuring that the conservation plan would be approved and properly considered prior to listing the species. *Id.* at 5. This Court found that:

> TRC's claims of injury from the timing of the [Service's] listing decision . . . fail to establish standing . . . TRC's purported interest is in ensuring that its [conservation plan] will be approved and properly considered prior to listing the Tehachapi slender salamander. It is unclear how intervening here would protect that interest. TRC does not allege and has not shown that its proposed habitat conservation plan will be approved or denied as a result of the instant lawsuit. . . . Because TRC has failed to show both causation and redressability with respect to this injury . . . the Court finds that TRC does not have standing to intervene in this case.

*Id.* at 5. Another judge on this court reached a similar conclusion in *Envt'l Defense v. Leavitt*, in which a coal

industry group attempted to challenge a consent decree which required the EPA to issue certain clean air regulations within a specified timeframe, but did not address the substance of those regulations. 329 F.Supp. 2d 55 (D.D.C. 2004). The industry group claimed that its interests were harmed because the regulations would be "artificially expedited" which would prevent "due deliberation." *Id.* at 68. The court rejected the claim, holding that the industry group "fail[ed] to show that the suggested timetable is inadequate or that modifications to the timetable are likely to be necessary, or that any such inadequacies or modifications would result in injury or impairment to" the industry group. *Id.*

The same analysis applies here. Plaintiffs do not show that their members' conservation efforts will be found sufficient or insufficient to protect the species as a result of the deadlines set forth in the Agreement. They also do not show that the Service will ignore or discount their conservation efforts as a result of the Agreements. Nor do Plaintiffs show the time-frames set forth in the Agreement are inadequate for the Service to make a determination whether or not listing is warranted. Nor could they, since the gopher and salamander species at issue have been on the candidate list for at least ten years.

Plaintiffs' reliance on *County of San Miguel v. MacDonald*, 244 F.R.D. 36 (D.D.C. 2007), is unavailing. In *San Miguel*, trade associations sought standing to intervene in an action seeking injunctive relief to order the Service to list a species of bird as "endangered" after the Service had determined that listing was "not warranted." *Id.* at 38. The trade association-intervenors argued that the relief sought would injure their members' existing and future conservation efforts to avoid listing the species. *Id.* at 44. The Court found that the trade associations had standing to intervene because the alleged injury to their members' conservation efforts to avoid a listing was fairly traceable to the relief sought, and redressable by a decision favorable to the intervenors. *Id.* at 44-45. Here, the Agreements that Plaintiffs oppose do not contemplate or dictate any actual listing decision for the species at issue. They only require the Service to find by specific dates whether listing of such species is warranted. Guardians Agreement, ECF No. 31-1 at 6; CBD Agreement, ECF No. 42-1 at 5-6. Acting under the schedule set forth in the Agreements, the Service has since found that listing is actually *not warranted* for five of the nine candidate subspecies of Mazama pocket gopher at issue. 77 Fed. Reg. at 73,770. Accordingly, the Court does not see how injury to Plaintiffs' members is fairly traceable to the Agreements—as opposed to the Service's actions independent of

the Agreements—or redressable by a court order to set them aside. *See Perciasepe*, 714 F.3d at 1325 (finding no standing where injury was based on the potential substantive outcome of the EPA's rulemaking); *Safari Club I*, 277 F.R.D. at 6 (finding no standing where injury was based on the potential substantive outcome of the Service's listing decision); *Tejon Ranch*, 270 F.R.D. at 5 (same).

In an effort to show that the voluntary conservation efforts of their members are consistent with the ESA, Plaintiffs point out that the Service has issued an advance notice of proposed rulemaking to create incentives for landowners to take voluntary conservation actions. Pl.'s Opp'n 16 (citing 77 Fed. Reg. at 15,352 (March 15, 2012)). However, referencing the Service's intent to promote voluntary conservation does nothing to confer standing where the alleged conservation injury is neither traceable to, nor redressable by, the Agreements that Plaintiffs seek relief from. Put otherwise, Plaintiffs fail to establish that the *Agreements*, not the Service's alleged failure to recognize their members' conservation efforts, cause the injury that their members complain of. *See Perciasepe*, 714 F.3d at 1325 n.7 (finding that the EPA's statements that it intended to update regulation did not confer standing, because "[intervenor] has the burden to establish that the *consent decree*—not EPA's throat clearing—will cause the injury of which

it complains."). Furthermore, as Defendants point out,
"voluntary efforts to undertake pre-listing [conservation
actions] provide no basis for Plaintiffs' purported injury."
Def.'s Reply 9. Plaintiffs "cannot manufacture standing by
choosing to make expenditures based on hypothetical future harm
that is certainly not impending." *Clapper*, 133 S. Ct. at 1143
(finding no standing for respondents whose alleged injury
consisted of costs incurred to avoid risk of harm by the
Government).

Because Plaintiffs fail to show that the injury is fairly
traceable to the Agreements or redressable by an order to set
them aside, the Court finds that Plaintiffs do not have standing
based on a purported injury to their members' conservation
efforts.[7] [8]

---

[7] By extension, for the same failure to satisfy the traceability
and redressability elements, Plaintiffs would also lack standing
to challenge the Agreements if the Service ultimately lists the
species covered by the Agreements. Plaintiffs could, of course,
directly challenge the final listing decision. *See, e.g.*,
*Safari Club II*, 704 F.3d at 977 (citation omitted).

[8] To the extent that Plaintiffs separately allege that their
members' conservation interest is injured by the Service's
warranted-but-precluded findings for candidate species living on
their land, *see* Pl.'s Opp'n 14 ("[t]he presence of candidate
species . . . on private property has a palpable effect on . . .
Plaintiffs' members"), the Court fails to see how setting aside
the Agreements protects that interest. Plaintiffs could have
sought judicial review of the Service's finding at any point
during the up to ten years that the species at issue were
warranted-but-precluded. *See* 16 U.S.C. § 1533(b)(3)(C)(ii)
(2012).

### b. Regulatory restrictions on property use and business operations

Plaintiffs also assert that the Agreements precipitate additional pre-listing regulatory restrictions by local authorities that injure their members' property and business interests. Pl.'s Opp'n 22. Plaintiffs illustrate this claim with a declaration by John Kaufman, a Plaintiff-member land developer in Washington state. Kaufman Decl. ¶¶ 1-4, ECF No. 14-2. Kaufman states that in the years before the Agreements, he engaged in efforts to protect the Mazama pocket gopher candidate species on his land in order to comply with state and local conservations and potentially obviate federal listing. *See* Kaufman Decl. ¶¶ 8-16. He states that his habitat management plan was "on track for final approval" by state and local authorities. *Id.* ¶ 17. According to Kaufman, once the Service entered into the Agreements, local authorities asked the Service to comment on his plan, *id.* ¶ 19, the Service recommended that the plan be modified, *id.* ¶ 20, and the local authorities then required Kaufman to implement these recommendations before they approved the plan, *id.* ¶ 20. From this sequence of events, Kaufman infers that "[w]hat [local authorities] deemed adequate protection for a 'candidate' species was suddenly not enough" once the Agreements were approved. *Id.* ¶ 24.

An action by a third party not before the court may cause injury for Article III standing when that action is a result of a determinative or coercive effect upon that third party. *See Bennett v. Spear*, 520 U.S. 154, 169 (1997). In *Bennett*, the Supreme Court held that Oregon ranchers had standing to challenge a Biological Opinion issued by the Service because the Opinion caused the Bureau of Reclamation to reduce water flows, which injured the ranchers. *Id.* at 169-71. The Supreme Court found that the Biological Opinion had a determinative or coercive effect on the Bureau because the Bureau would be subject to the Service's enforcement action if it did not comply with the Opinion. *Id.* at 170. Here, Plaintiffs do not show that the Service's recommendations had a determinative or coercive effect on local authorities such that they were compelled to implement the recommendations. Def.'s Reply 16, n.10 (explaining that the local authorities faced "no legal consequences if they disagreed with the Service's recommendations" regarding Plaintiff's proposed habitat management plan). That the local authorities independently sought out and incorporated the Service's recommendations once the Agreements were announced does not establish that the Agreements caused them to do so.

Injury cannot be the result of "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

Plaintiffs fail to show that the Agreements—as opposed to the Service's actions separate from the Agreements, or the independent action of local authorities—caused or will cause increased regulatory restrictions.  Again, the Agreements "only require the Service to determine whether or not to list the [251 candidate] species within the next several years, not to reach any particular result."  *See Safari Club I*, 277 F.R.D. at 5. Nor do Plaintiffs show that local authorities were compelled to adopt the Service's regulatory recommendations.  Accordingly, Plaintiffs cannot establish their members' standing based on increased regulatory restrictions resulting from the Agreements. *See Perciasepe*, 714 F.3d at 1327 (denying standing where trade association did not support its argument that a consent decree, rather than the EPA's actions apart from the decree, caused the purported injury).

>    2. <u>Procedural violations underlying Plaintiffs' injuries</u>

Plaintiffs' alleged injuries are based on the underlying claim that by acting pursuant to the Agreements, the Service fails to follow ESA-mandated procedures.  *See* Compl. ¶ 80-95. To establish standing to challenge the Service's failure to abide by a statutory procedure, Plaintiffs must show that the procedures in question are "designed to protect some threatened concrete interest" of their members.  *Florida Audubon Soc. v.*

*Bentsen*, 94 F.3d 658, 667 (D.C. Cir. 1996) (quoting *Lujan*, 504 U.S. at 573 n.8). Plaintiffs must also show "not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Id.* at 664-665. For the reasons below, the Court finds that Plaintiffs fail to do so, and therefore lack standing on the basis of alleged procedural violations.

First, Plaintiffs claim that the Agreements require the Service to abandon statutorily required procedures for determining whether listing a candidate species is precluded. Compl. ¶¶ 76, 81-82. Second, they claim that the Service discards the procedure for prioritizing candidate species for listing. *Id.* ¶¶ 77, 84-86. Third, Plaintiffs claim that the Agreements change the procedure for listing species without allowing public notice and comment. *Id.* ¶ 78, 91-95. Finally, they claim that the Agreements require the Service to make decisions that disregard the best scientific and commercial data available. *Id.* ¶¶ 77, 88-89.

These claims of procedural violations have been considered and rejected by this Court and Circuit in *Safari Club I* and *Safari Club II*. In the *Safari Club* cases, movant-intervenor Safari Club proffered a number of procedural bases for standing to intervene in the MDL that gave rise to the Agreements.

Safari Club first claimed that the ESA required the Service to decide whether listing was precluded before proposing to list a species. *Safari Club II*, 704 F.3d at 977. The Circuit found that:

> [a]lthough the Service must make one of three findings—that listing a species is not warranted, is warranted, or is warranted but precluded . . . , 16 U.S.C. § 1533(b)(3)(B), the ESA does not require the Service to find that listing a species is precluded under any specific circumstances.

*Safari Club II*, 704 F.3d at 977. Plaintiffs have not attempted to distinguish their claim from Safari Club's.

Next, Plaintiffs claim that by entering into the Agreements, the Service modified its priority ranking system such that the Service no longer proposed to list candidate species in the order of their assigned priority number. *Id.* ¶¶ 77, 84-86. Again, this claim was considered and rejected in the *Safari Club* decisions. This Court found that:

> [while] the [ESA] requires [the Service] to establish guidelines to include "a ranking system to assist in the identification of species that should receive priority review[,]" [16 U.S.C. § 1533(h),] [t]he rankings do not create any requirement—procedural or otherwise—that the agency consider the species in the order they are ranked.

277 F.R.D. at 7. The same is true here of Plaintiffs' second claim.

Safari Club also asserted that the Service may not modify its priority ranking system without proper notice and comment.

*Id.* As to that assertion, this Court held that the ESA "does not require that [the Service] must provide notice and comment before applying the [priority listing] guidelines to any species." *Id.* (explaining that when the Service adopted the priority guidelines thirty years ago, the Service stated "the priority systems presented must be viewed as guides and should not be looked upon as inflexible frameworks for determining resource allocations." 48 Fed. Reg. 43,098 (Sept. 21, 1983). On appeal, the Circuit similarly found that "neither the ESA nor the implementing regulations require the Service to invite comment when it makes a warranted-but-precluded finding." *See Safari Club II*, 704 F.3d at 979 (citing 16 U.S.C. § 1533(b)(3)(B)(2012)). Again, Plaintiffs' "notice and comment" claim is virtually identical those asserted by Safari Club in this Court and on appeal, and is rejected for the same reasons.

Finally, Plaintiffs claim that the Agreements compel the Service to make warranted findings without regard for the best scientific and commercial data available. *Id.* ¶¶ 77, 88-89. This Circuit has already found that the ESA does not provide a mechanism for judicially reviewing warranted findings. 16 U.S.C. § 1533(b)(3)(C)(ii)(2012); *Safari Club II*, 704 F.3d at 977; *see, e.g.*, *Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001) (finding that "[a]ppellants misread § 1533(b)(1)(A): the Service must utilize the 'best scientific . . . data

*available*,' not the best scientific data *possible*.").  "When the
Service proposes to formally list a [candidate] species, the ESA
provides no means for the Safari Club to assert that formal
listing of the species is precluded.  Congress' failure to
provide the Safari Club with a means to require continued
warranted-but-precluded findings reinforces the conclusion that
the ESA contains no such procedural right."  *Safari Club II*, 704
F.3d at 977-78.[9]

    In short, Plaintiffs' assertions that the Service violates
Section 4 procedures for listing species are indistinguishable
from those that this Court and Circuit considered and rejected
in the *Safari Club* cases.  They neither identify a listing
procedure that the Agreements require the Service to violate,
nor identify a listing procedure that is designed to protect
their members' interests.  Therefore, Plaintiffs fail to
establish standing based on alleged violations of statutory
procedure.

---

[9] The Court notes that Plaintiffs aggrieved by a warranted
finding—and the proposed rule that issues from such a finding—
are not without remedy.  Plaintiffs may request a public hearing
on the proposed rule.  16 U.S.C. § 1533(b)(5)(E)(2012).  And
Plaintiffs may challenge the Service's final rule listing the
species, if such listing occurs.  *Safari Club II*, 704 F.3d at
977; *see, e.g.*, *In re Polar Bear Endangered Species Act Listing
and Section 4(d) Rule Litig.*, 709 F.3d 1, 2 (D.C. Cir. 2013)
(considering challenges to the Service's listing of the polar
bear as a threatened species).

## IV. CONCLUSION

Plaintiffs do not establish injury to their members sufficient for Article III standing. On the theory of injury to their members' conservation interests, the alleged injury is not fairly traceable to the Agreements or redressable by an order to set them aside. On the theory of increased regulatory restrictions prior to listing, Plaintiffs fail to show that the Agreements cause or will cause those restrictions, or that the Service compelled a third party to adopt them. Finally, Plaintiffs do not establish that the Section 4 listing procedures are designed for their members' benefit, or that the Agreements require the Service to violate any statutory procedure. The Court notes that Plaintiffs aggrieved by the listing process are not without remedy. "Warranted-but-precluded" findings are judicially reviewable. In addition, Plaintiffs aggrieved by a warranted finding may challenge the Service's final rule listing the species. Accordingly, for the reasons stated herein, the Court **GRANTS** Defendants' motion to dismiss and **DENIES** Plaintiffs' prayer for injunctive and declaratory relief. In light of the foregoing, the Court **DENIES AS MOOT** Center for Biological Diversity's motion to intervene in

this action.  An appropriate Order accompanies this Memorandum

Opinion.

**SO ORDERED.**

**SIGNED:   Emmet G. Sullivan**
**United States District Court Judge**
**March 31, 2014**